**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

UNITED STATES OF AMERICA,

v.

AQUARIUS GUMBS.

No. 3:23-cr-62-2 (OAW)

## ORDER DENYING MOTION TO SUPPRESS

Defendant Aquarius Gumbs was indicted by a Grand Jury on five criminal counts: (1) Conspiracy to Possess with the Intent to Distribute, and the Distribution of, Controlled Substances, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (2) Distribution and Possession with the Intent to Distribute Cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (3) Possession with the Intent to Distribute Marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(D); (4) Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i); and (5) Felon in Possession of a Firearm, pursuant to 18 U.S.C. §§ 922(g)(1) and 924(a)(8); as listed at Counts One, Five, Eight, Nine, and Ten of the Indictment. *See* ECF No. 21.

The Criminal Complaint alleges that Mr. Gumbs participated in a conspiracy to manufacture and distribute wholesale quantities of counterfeit oxycodone tablets (containing fentanyl) and counterfeit Adderall tablets (containing methamphetamine) in and around New Haven, Connecticut, and distributed other controlled substances, including heroin, marijuana, and cocaine. *See* ECF No. 1. On November 18, 2022, federal agents executed a search warrant at Mr. Gumbs's residence, 21 Batter Terrace in New Haven, Connecticut. Mr. Gumbs moves to suppress the fruits of that search.

On November 29, 2023, Mr. Gumbs filed his original motion to suppress.  ECF No. 283.  On December 22, 2023 the government responded to that motion.  ECF No. 329.  On June 6, 2024, the defendant moved to proceed pro se.  ECF No. 561.  The request was granted by Judge Garcia three weeks later.  ECF No. 606.  On July 2, 2024, Mr. Gumbs requested an extension of time to file a supplemental motion to suppress.[1]  ECF No. 615.  Citing Defendant's self-represented status, but then the trial's schedule, the court granted the requested extension followed by subsequent requests related thereto.  *See* ECF Nos. 676, 698.

On August 20, 2024 Mr. Gumbs filed his supplemental motion.  ECF Nos. 687 and 689.  On September 4, 2024 Defendant made another motion, this time to replace his supplemental motion to suppress with a "corrected" version.  ECF No. 739.  The court granted his motion (ECF No. 752), and Mr. Gumbs filed the operative motion to suppress at ECF No. 741.  On September 20, 2024, the government submitted its response (ECF No. 793) and on September 27, 2024 Mr. Gumbs submitted a reply (ECF No. 825).  The next day, Mr. Gumbs requested to replace his reply with a corrected version, and the court accepted his corrected reply, *see* ECF Nos. 832 and 850.

The court has reviewed and has carefully considered the parties' submissions.  For the following reasons, the motion to suppress hereby is **DENIED.**

I.    **LEGAL STANDARD**

---

[1] Of note, Defendant did not request to file other memoranda concerning, for example, a supplement to his then-pending motion to dismiss, seizure of his phone (ECF No. 764), or whether the government should be compelled to compare drugs found at various stages of the alleged conspiracy (ECF No. 700).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and prohibits the issuance of warrants without "probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

Further, Fourth Amendment claims require standing; they invoke "personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Rakas v. Illinois*, 439 U.S. 128, 134 (1978).

## A. Review Standard

Warrant-based searches are presumptively reasonable. *United States v. Lauria*, 70 F.4th 106, 120 (2d Cir. 2023). "Nevertheless, where the presumption is overcome, even evidence obtained pursuant to a warrant can be suppressed." *Id.* "[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978), *Lauria*, 70 F.4th 106, 124-125. Thus, a defendant seeking "[t]o suppress evidence obtained pursuant to an affidavit containing erroneous information" must satisfy state of mind and materiality requirements by showing that "(1) the claimed inaccuracies or omissions are the result of the affiant's

deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the issuing judge's probable cause finding." *Lauria*, 70 F.4th 106, 125 (alteration in original) (internal quotation marks and citation omitted).

### B.  Probable Cause

Probable cause analysis involves a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit...there is a fair probability that contraband or evidence of a crime will be found." *United States v. Boles*, 914 F.3d 95, 102 (2d Cir. 2019).  "Probable cause 'is not a high bar.'" *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Kaley* v. *United States*, 571 U. S. 320, 338 (2014)).

Law enforcement is entitled "to draw reasonable inferences from [the] facts in light of their knowledge . . . and . . . experience" in finding probable cause.  *United States v. Ortiz*, 422 U.S. 891, 897 (1975), *United States v. Pabon*, 871 F.3d 164, 173 (2d Cir. 2017) (describing this analysis "from the perspective of an objectively reasonable police officer, recognizing that the officer is entitled to draw reasonable inferences on the basis of his prior experience").  Still, the discovery of fruits of a crime cannot retroactively support a finding of probable cause because courts "do not evaluate probable cause in hindsight." *Florida v. Harris*, 568 U.S. 237, 249 (2013).

### C.  Particularity and Overbreadth

The Fourth Amendment requires the warrant to state, with particularity (and without overbreadth), the items sought and the places to be searched.  U.S. Const. amend. IV.

### D.  The Exclusionary Rule

The Supreme Court of the United States "establish[ed] an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial," to "safeguard

Fourth Amendment rights generally through its deterrent effect." *Herring v. United States*, 555 U.S. 135, 139–40 (2009).  However, exclusion is a "last resort," and not a "first impulse." *Id.*  "The extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct." *Id.* (citation omitted).  The exclusionary rule's deterrence value "justifies its cost when police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights." *United States v. Raymonda*, 780 F.3d 105, 117–18 (2d Cir. 2015) (quotations omitted).  Conversely, "when police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence," exclusion is not warranted because there is "nothing to deter." *Id.* (quotations omitted).

### E. The Good Faith Exception

"A determination that the warrant at issue was not supported by probable cause to search the entire multi-family dwelling does not automatically dictate the suppression of all physical evidence seized or statements derived therefrom."  *United States v. Clark*, 638 F.3d 89, 99 (2d Cir. 2011).  When an officer genuinely believes a warrant is valid and executes it in good faith, there is no conscious violation of the Fourth Amendment (and therefore nothing to deter).  However, "the good faith exception cannot shield even an officer who relies on a duly issued warrant in at least four circumstances: '(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.'"  *Raymonda*, 780 F.3d 118 (citing *United States v. Clark*, 638 F.3d 100) (internal quotation marks omitted).

II.   **DISCUSSION**

A.  **Introduction**

The defendant's argument is often unorganized and difficult to follow.  Similarly, his description of certain exhibits does not match its contents.  For example, Mr. Gumbs describes Exhibit H as a "copy of the original line sheet," but that document cannot be found there.  *Compare* ECF No. 692, pgs. 32-55 with ECF No. 741, pg. 17.  He also cites body-worn camera footage that is not submitted.  *See, e.g.,* ECF No. 741, pg. 31.  Still, the court has attempted to read Mr. Gumbs's arguments as accurately as possible.

B.  **Standing**

As a preliminary matter, Mr. Gumbs does not have standing to assert constitutional violations on behalf of others.  *See United States v. Bedell*, 311 Fed. Appx. 461, 462-463 (2d Cir. 2009) (summary order) (citing *Rakas*, 439 U.S. 133-34).   That the search allegedly violated the rights of other tenants is of no moment.   For example, he claims "[t]he third floor [of 21 Batter Terrace] was and is still leased to Markie Bowman and her two adolescent children [who] were subjected to this illegal intrusion."  ECF No. 741, pg. 4.  He also claims that the police overlooked the tenants on the first floor.  *Id.*

Fourth Amendment rights are personal.  Mr. Gumbs's motion cannot prevail by raising arguments implicating the rights of third parties.  That is especially true here where the government submitted evidence that he occupied or had access to most floors in the home and he did not "endeavor to show circumstances regarding his relationship with the other renters, their particular use of the common areas, or any other factor that might  conceivably form the basis of a conclusion that the officers' presence in the basement, hallways, or stairwells of 21-23 Batter Terrance implicated Defendant's

reasonable privacy expectations." *United States v. Bedell*, 311 Fed. Appx. 461, 463 (2d Cir. 2009); *see Tarantino v. City of Hornell*, 615 F. Supp. 2d 102, 109 (W.D.N.Y. 2009) ("It is well established that a landlord does not have a reasonable expectation of privacy with respect to property that he has rented to a tenant, and that is occupied by that tenant") *abrogated on other grounds by Analytical Diagnostic Labs, Inc. v. Kusel*, 626 F.3d 135 (2d Cir. 2010).Thus, any claim that his motion must prevail based on other tenants' rights is rejected and denied. *See Rakas*, 439 U.S. 134.

### C. <u>Probable Cause, Generally</u>

#### i. <u>Alleged Transaction Involving Mr. Gumbs, Taylor, and Apotrias</u>

The warrant affidavit details a transaction between codefendants W. Taylor and M. Apotrias.    Around 10:47 a.m. on or about June 28, 2022, Apotrias contacted Taylor seeking "28 players" for a game of basketball.  Search Warrant Affidavit ("SW Aff.") ¶ 72. Basketball teams have five players on the court whereas there are 28 grams in an ounce (which is a common measurement of cocaine).  SW Aff. ¶ 73; *see also United States v. Compton*, 704 F.2d 739, 742 (5ᵗʰ Cir. 1983) (providing the street value of 28 grams of cocaine).  Taylor responded, "let me see what I got" and Apotrias specified that he wanted the "kid with the shiny sneakers."  *Id.*  Based on the affiant's experience, high-quality cocaine is referred to as "fish scale" cocaine because it has an iridescent shine.  SW Aff. at ¶ 73.  Taylor ended the call by asking for Apotrias to "give [him] an hour." *Id.* ¶ 72.

Minutes (if not seconds) later, Taylor called Mr. Gumbs, asking, "Can I um . . . catch up to you?"  *Id.* ¶ 74.  Gumbs answered affirmatively and implied that Taylor should meet him in New Haven.  At 12:34 p.m. investigators observed Taylor leave his residence; they maintained surveillance and followed him to 21 Batter Terrace, the subject location

of this motion. *Id.* ¶ 76. While outside, Taylor briefly spoke with Gumbs who confirmed that he was inside. *Id.* Then, Taylor was seen entering the home and walking down stairs that lead to the basement. *Id.* ¶¶ 76-78. Without any communication from Apotrias (and still inside 21 Batter Terrace), Taylor called Apotrias and asked "Mark did you get tied up? You said an hour I ran and did what you asked." *Id.* ¶ 79. That is, Taylor indicated he was fetching the "28 players," and the "kid with shiny sneakers" from 21 Batter Terrace.

Later that day, Apotrias reconnected with Taylor, who was still at 21 Batter Terrace. Apotrias indicated a gas leak delayed him and Taylor asked whether Apotrias "still want[ed] all those 28 guys?" *Id.* ¶ 80. Apotrias confirmed and insisted "it" should be the "old school," eventually noting, "I'll just look at *it* and I'll know." *Id.* (emphasis added). Notably, Apotrias and Taylor consistently refer to the "28 players" as "it." Such reference in the singular to "28 players" further supports that the two are speaking in code to mask their true topic. *United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir. 1995) (stating that "[u]se of such a narcotics code is certainly supportive of a probable cause finding," regardless of whether "narcotics code can provide the sole basis for the issuance of a warrant" (internal quotation marks and citation omitted)).

Apotrias and Taylor coordinated a meeting at Home Depot in East Haven, Connecticut. *Id.* ¶ 82. Taylor left 21 Batter Terrace around 5:00pm and traveled to the meeting location where he was seen parking his Buick next to a white truck.[2] *Id.* ¶ 84. Apotrias exited the white truck and entered the front passenger seat of Taylor's Buick. *Id.* Eventually, Apotrias exited Taylor's Buick, got in his truck, and drove away. *Id.*

---

[2] This is consistent with the facts submitted in support of wiretapping codefendant Lauria's phone. *See United States v. Lauria*, No. 23-cr-62 (OAW), 2024 U.S. Dist. LEXIS 181258, *7 (D. Conn. Oct. 3, 2024).

Officers maintained surveillance and followed Apotrias. *Id.* ¶¶ 84-85. Once parked, surveillance observed several people approach Apotrias's vehicle. *Id.* ¶ 85. Investigators watched as Apotrias performed several hand-to-hand transactions with those who approached. *Id.* Apotrias completed the exchanges and drove away. *Id.*

East Haven Police performed a traffic stop of Apotrias's vehicle. *Id.* ¶¶ 86-87. The officer who performed the stop ordered his K9 to do an exterior sweep of the vehicle, but the K9 did not alert to the presence of drugs, and Apotrias was free to go. *Id.* Days later, Apotrias called Taylor and discussed what happened after their meeting at Home Depot. *Id.* ¶¶ 87-88. He discussed the stop by East Haven Police and indicated he was "dirty" during the stop. *Id.* ¶ 88.

A reasonable interpretation of these facts is that Gumbs supplied Taylor with cocaine who in turn gave it to Apotrias for sale. *United States v. Stewart*, 3:17-cr-00072 (RNC), 2019 U.S. Dist. LEXIS 78376 *4 (D. Conn. May 9, 2019) (finding, "Probable cause to search a location for contraband following a sale of narcotics may be established by observations of the seller going to the location immediately before or after the sale."); *see United States v. Rodriguez*, 115 F.4th 24 (1st Cir. 2024) (same), *United States v. Flynn*, 353 F. Supp. 3d 76, 81 (D. Mass. 2018) (same) *United States v. Ripley*, No. 21-cr-7362022, 2022 WL 17082114, U.S. Dist. LEXIS 210037, *10 (N.D. Ohio Nov. 18, 2022) (same); *see also  United States v. Muhammad*, 520 F. App'x 31, 38 (2d Cir.) (summary order) ("[t]he short time between [defendant's] transactions . . . and his arrival at his . . . home provides a reasonable inference of a nexus between the drug purchases and his residence based on common sense") (internal quotations omitted), *cert. denied*, 571 U.S. 853 (2013), *United States v. Londono,* 659 F. Supp. 758, 766 (E.D.N.Y.

1987) (finding probable cause to search home where defendant was arrested shortly after leaving it, carrying narcotics records and expensive jewelry). Indeed, after the "order" from Apotrias, Taylor went to 21 Batter Terrace (specifically the basement) to meet Gumbs. Taylor did not leave 21 Batter Terrace until he received confirmation that Apotrias wanted "28 players." He also did not leave the location with 28 athletes in tow.

Mr. Gumbs contends that the affiant lied in his affidavit and cites to Exhibit H for claimed support, but no such exhibit is attached to his motion. Further, any purportedly innocent explanation for these facts does not negate probable cause. *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985), *United States v. Gotti*, 42 F. Supp. 2d 252, 280 (S.D.N.Y. 1999) (holding differing reasonable interpretations of ambiguous conversations does not warrant a *Franks* hearing or suppression); *see also United States v. Dorfman*, 542 F. Supp. 345, 359 (N.D. Ill. 1982) ("[D]efendants' position…that the presence of innocent explanations for much of the information presented in the applications…vitiates the warrants, must be rejected."). Even if the innocent explanation were correct, the fact that an affiant may have been mistaken in some of his interpretations will not invalidate his affidavit if he had been justified in his presumptions that coded conversations were occurring and that they were indicative of the suspected crimes. *United States v. Feola*, 651 F. Supp. 1068, 1096 (S.D.N.Y. 1987), *aff'd*, 875 F.2d 857 (2d Cir. 1989).

### ii.  Alleged Transaction Involving Mr. Gumbs and Greatsinger

Around 7:16 p.m. on October 15, 2022, Mr. Gumbs received a phone call from codefendant Richard Greatsinger. SW Aff. ¶ 92. Prior intercepts established that Greatsinger was a narcotics customer of Mr. Gumbs. *Id.* On that call, Greatsinger requested to "come by real quick." *Id.* Mr. Gumbs asked for a half-hour to clean-up a

10

sewage back-up and Greatsinger responded "7:47 [p.m.] it is bro."  *Id.*  Mr. Gumbs confirmed; Greatsinger remarked "alright, have some tasty drinks for me.  You heard?" and laughed as the call terminated.  *Id.*  Based on prior intercepts, the affiant stated that Greatsinger and Gumbs often used alcoholic beverages as code for drug deals.  *Id.* ¶ 93.

Hours later, Greatsinger arrived at 21 Batter Terrace.  *Id.* ¶ 94.  He entered the side door previously used by Taylor, as discussed earlier.  *Id.*  The affiant stated that he believed the side door led to the basement and the upper-level floors of the building.  *Id.*  Location data on Gumbs's phone indicated he was in the area of 21 Batter Terrace.  *Id.*

Shortly after midnight, Greatsinger left the home.  *Id.* ¶ 95.  DEA agents coordinated with West Haven police for a walled-off stop of Greatsinger's vehicle.  *Id.*  Soon thereafter, a K9 officer arrived and ordered the dog to perform a sweep outside Greatsinger's Ford Explorer.  *Id.*  The canine alerted to the presence of narcotics and the ensuing search of Greatsinger's vehicle uncovered a knotted plastic bag containing approximately 25 grams of a white powdery substance that subsequently tested positive for cocaine hydrocholoride.  *Id.*

Mr. Gumbs's arguments about these events are unavailing.  He takes issue with affiant's characterization of "drug code" and states, without citation, that the "U.S. Court of Appeals for the Second Circuit has interpreted Fed. R. Evid. 702 to permit testimony regarding the interpretation of coded phrases pertaining to drug transactions only where those phrases have a fixed meaning either within the narcotics world or within a particular conspiracy."  ECF No. 741, pg. 23.  However, "the Federal Rules of Evidence do not apply on a motion to suppress."  *United States v. Rittweger*, 258 F. Supp. 2d 345, 348 (S.D.N.Y. 2003); *see also United States v. Raddatz*, 447 U.S. 667, 679 (1980) ("At a suppression

hearing, the court may rely on hearsay and other evidence, even though that evidence would not be admissible at trial."). Several of Mr. Gumbs's other arguments deal with the speculative nature of the affiant's conclusions, or merely target the weight of the evidence. The standard at this stage is well short of certainty. *Rilling*, 921 F.3d 48, 69 (2d Cir. 2019*)* ("Probable cause does not demand that an officer's good-faith belief that a person has committed a crime be correct or more likely true than false"), *United States v. Nelson*, 103 F. Supp. 2d 512, 513 (N.D.N.Y. 1999) (denying suppression where the defendant's arguments went to the weight of the evidence rather than to its exclusion).

The affiant reasonably interpreted the events leading up to and including Greatsinger's arrest as suggesting that Mr. Gumbs kept drugs inside 21 Batter Terrace. Greatsinger arranged to go to Mr. Gumbs's property, and shortly after leaving it, was arrested for possessing cocaine. The commonsense inference that Greatsinger obtained drugs from Mr. Gumbs at that location is supported by their coded language. *Cancelmo*, 64 F.3d 808; *see also Ripley*, 2022 U.S. Dist. LEXIS 210037, *4-5 (finding probable cause where defendant referred to methamphetamine as "windows"). Finally, laughing after asking for "tasty drinks" supports the inference that coded language was being used. Mr. Gumbs's interactions with Greatsinger and the events that transpired shortly thereafter support (and perhaps independently establish) probable cause.

### iii.  Customer Arrives at 21 Batter Terrace

On October 28 2022, an apparent customer arrived at Gumbs's residence to purchase heroin. The customer texted Gumbs "Yo I am with fuzz we r outside," "we're out side she needs to read the paper," "do you have it," and "send happy out." SW Aff. ¶ 97. The affiant stated that he knows that "paper" is a term commonly used by purchasers

of heroin and that "read the paper" was code for needing to buy heroin. The affiant further states that Velvet Brown a.k.a. "Happy" resides on the third floor of 21 Batter Terrace and is involved with Mr. Gumbs's narcotics activities. *Id.* ¶¶ 98-99. The customer then added "I got 30 for paper" and followed-up with "in the backyard." Id. ¶ 104. Gumbs responded "I don't do illegal she[sic] get away from my house with all that dumb shit. Don't want or need $30. I'm fickikng[sic] legit." *Id.* So, he confirmed "paper" refers to something illegal, that its value was 30 dollars, and, to his credit, that he did not engage in illegal activity.

The government argues this claim of legitimacy attempted to thwart federal investigators (like the apparent attempt to suggest that someone wished to illegally purchase a $30 newspaper), predicated on the fact that police arrested Taylor days earlier with codefendant Paul Paolella. Id. ¶ 106. The affiant also believed the drug transaction went forward despite Mr. Gumbs's objections.[3] *Id.* Indeed, the claim of being "legit" does not undermine this court's conclusion that the events on October 28, 2022, support a finding of probable cause. *Panetta v. Crowley*, 460 F.3d 388, 396 (2d Cir. 2006) (holding claimed innocence alone generally does not vitiate probable cause). Hopeful customers understood Mr. Gumbs was involved with the drug trade. They knew where he lived, felt comfortable texting him, calling him, and approaching his residence asking for drugs. Further, they knew another individual lived in the home and still felt comfortable enough going there, suggesting a level of familiarity consistent with a finding of probable cause. Thus, the court finds the events of October 28, 2022, support finding probable cause.

---

[3] Still, the court notes that the affiant does not articulate in the affidavit why they believe the drug transaction went forward despite Mr. Gumbs's objections, thus the court does not arrive at that conclusion in weighing whether probable cause has been established.

Together, and independently, these three events establish probable cause that Mr. Gumbs was engaged in a conspiracy to distribute and possess controlled substances. Further, that many of the events included his home, 21 Batter Terrace, supports finding a nexus between his residence and his drug activity. *See United States v. Thomas*, 989 F.2d 1252 (D.C. Cir. 1993) (probable cause to search defendant's residence based upon premise that defendant was involved in narcotic transaction and government agent stated that in his experience drug traffickers maintain evidence of their illegal activities in their homes), *United States v. Williams*, 350 F. Supp. 3d 261, 268 (W.D.N.Y. 2018) ("An investigator's opinion that based on training and experience, drug traffickers maintain evidence of their illegal activities at their residences, may assist in establishing probable cause to search. Generally, an investigator's opinion in this regard is based on background evidence of significant, on-going drug trafficking activity."); *see also United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (nexus "may be based on reasonable inference from the facts presented based on common sense and experience").

### iv. Alleged Misstatements

Mr. Gumbs frequently references and suggests "lies," but his claims lack merit.[4] Even if the court credited many such claims, suppression still would be denied due to independent probable cause. *Lauria*, 70 F.4th 125; *see United States v. Osterman*, 110 F.4th 928, 935 (7th Cir. 2024) (holding misstatements in an affidavit to be immaterial to an ultimate finding of probable cause). Nevertheless, the court offers brief review.

---

[4] For example, in response to the SW Affidavit claiming a large object consistent with a pill press was moved into 21 Batter Terrace but was not seen leaving (a claim this court need not consider), Mr. Gumbs argues with little support that "there was never a pill press in Batter Terrace" and that because the affiant's account was so "detailed," it suggests incontrovertible "deceptions that cannot be ignored." ECF No. 741, pg. 14. He adds that such "treachery [represents] blatant lies and misrepresentation of people and evidence presented by Pfeiffer, who has been sworn under oath to uphold the law and protect its citizens but instead uses the system to swindle the Constitution of its protections for every man, woman, and child." *Id.*

The affidavit details several allegations involving a pill press. Specifically, in the summer of 2021, law enforcement learned from a cooperating witness that Taylor purchased pill presses from that witness in the past. SW Aff. ¶ 12. "Based on surveillance prior to beginning wiretap interceptions, however, investigators came to believe that [Taylor] had moved a pill press from 26 Kendall Street to [21 Batter Terrace], which is utilized by [Mr.] Gumbs." *Id.* ¶ 14. Often without supplying the exhibits he references, Mr. Gumbs avers that the affiant's inconsistent singular and plural "pill press" references suggest deliberate misrepresentations. Such references are immaterial, even in context (as they do not foreclose the possibility that someone moved the pill press there), and they certainly are not reckless. Calling a scrivener's error a lie does not make it so. Defendant also offers a "table of contents" to describe where authorities said a pill press was located and when. *See* ECF No. 741, pgs. 15-16. But that table of contents is not inconsistent with the pill press's presence at 21 Batter Terrace because it does not show the "simultaneous locations" it purports to prove. Instead, it shows the government's belief that the pill press may have been at 21 Batter Terrace on May 18, 2022. The government does not claim the pill press absolutely remained there in perpetuity – and probable cause does not require them to do so.

In sum, nothing Mr. Gumbs alleges constitutes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit.

### D. Particularity and Overbreadth

The Fourth Amendment "requires particularity and forbids overbreadth" as to warrants. *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009). "Although

somewhat similar in focus, [overbreadth and particularity] are two distinct legal issues: (1) whether the items listed as 'to be seized' in the warrant were overbroad because they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers." *United States v. Ayala*, No. 22-cr-282 (VSB), 2024 U.S. Dist. LEXIS 121597, *37-38 (S.D.N.Y. Jul. 11, 2024) (alteration in the original) (quoting *United States v. Hernandez*, No. 09-CR-625 (HB), 2010 U.S. Dist. LEXIS 719, 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010).

### i. Particularity

"[T]he particularity requirement 'makes general searches…impossible and prevents the seizure of one thing under a warrant describing another.  As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'" *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)); *see also United States v. Wey*, 256 F. Supp. 3d 355, 380 (S.D.N.Y. 2017).  "The manifest purpose of this particularity requirement was to prevent general searches." *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020) (quoting *Maryland v. Garrison*, 480 U.S. 79, 84 (1987)).

"To be sufficiently particular under the Fourth Amendment, a warrant must satisfy three requirements.  First, a warrant must identify the specific offense for which the police have established probable cause.  Second, a warrant must describe the place to be searched.  Finally, the warrant must specify the items to be seized by their relation to designated crimes." *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (internal citations and quotations omitted), *abrogated on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018).

Mr. Gumbs argues the affiant's failure to identify the building as "21-23 Batter Terrace" means the warrant failed to describe the place to be searched with particularity, but "[e]ven a warrant containing partial misdescriptions of the place to be searched is sufficient if the officer executing the warrant could ascertain and identify the target of the search with no reasonable probability of searching another premises in error." *United States v. Williams*, 69 Fed. Appx. 494, 496 (2d Cir. 2003) (citation and internal quotation marks omitted). "Warrants have been upheld despite technical error, such as an incorrect street address, when the possibility of actual error is eliminated by other information," here, a precise physical description and photo of the home to be searched. *United States v. 500 Delaware St.*, 949 F. Supp. 166, 170 (W.D.N.Y. 1996) (citing *Velardi v. Walsh*, 40 F.3d 569, 576 (2nd Cir. 1994)); *see* SW Aff. ¶ 8(c), pg. 84. The warrant included a picture of the home and made clear that police could search the entire premises. SW Aff. ¶ 8(c), pg. 84. Thus, there was little if any room for error because the warrant guided police with a photograph of the premises and law enforcement would be able to readily ascertain and identify their target based on the photograph, the address, and the authority to search the basement, first, second, and third floors.

Lastly, Mr. Gumbs's claim as to the warrantless seizure of firearms is unavailing. Plain view is an exception to the Fourth Amendment's warrant requirement. *Horton v. California*, 496 U.S. 128, 134 (1990). It holds that "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). It is of no moment that the guns were found in a dresser and bag. *United States v. Gamble*, 388 F.3d 74, 76-77 (2d

17

Cir. 2004) (affirming district court finding that plain view exception applied to ammunition clip found in dresser where police were searching for cocaine and drug paraphernalia).

### ii. Overbreadth

The Fourth Amendment demands that a search warrant for a multitenant building be supported by a showing of probable cause as to each unit.  *United States v. Wiggins*, 298 F.R.D. 75, 78 (E.D.N.Y. 2014) (citing *United States v. Clark*, 638 F.3d 89).  "Indicia of whether a building is single or multi-resident includes visual surveillance, police records, public records, and utility company records." *Wiggins*, 298 F.R.D. 79 (citing *Garrison*, 480 U.S. 86 n.10, *United States v. Kyles*, 40 F.3d 519, 524 (2d Cir. 1994)).

A defendant's control of a multitenant building can establish probable cause to search it in its entirety.  Such control can be proven through degrees of "ownership, occupancy, access, [and the] authority to exclude others."  *United States v. Clark*, 638 F.3d 95.  But conclusory allegations that the defendant "controlled" a multi-family dwelling are insufficient to allow a judge to find probable cause.  *Id.* at 105.

Here, the government alleged Mr. Gumbs controlled the target premises.  The affidavit notes that records received from a public utility company showed that an LLC held a contract for the third floor, and a check of Connecticut state business records established Mr. Gumbs as the primary agent of that LLC.[5]  As for the second floor, "New Haven Police Department records and in-house database show [Mr. Gumbs] and [Roan] both reside at 21 Batter Terrace, 2nd Floor, and may be involved in a personal relationship."  SW Aff. ¶ 8(c).  The government also alleges that Mr. Gumbs sold the property to a straw purchaser (in an attempt to evade police surveillance) but maintains

---

[5] The affidavit also set forth facts showing Mr. Gumbs had access to the third floor.  SW Aff. ¶ 8(c).

control of the residence as shown by his representation of the purchaser in order to obtain financial relief under a UniteCT program offering rental assistance to Connecticut homes. Further, Defendant's brief appears to concede that he utilized the second floor as a residence and that he "managed the property" since 2013. ECF No. 741, pgs. 3, 30-33. Thus, at a minimum he had access to the second and third floors (the latter by virtue of his company being listed as the contract holder) and the court considers, but need not decide for reasons detailed later, whether being the in-house manager provided Mr. Gumbs with access to all parts of the building, including the first floor. *See Tarantino*, 615 F. Supp. 2d 102, 109 (W.D.N.Y. 2009) ("It is well established that a landlord does not have a reasonable expectation of privacy with respect to property that he has rented to a tenant, and that is occupied by that tenant").

Further, officers' observations that Mr. Gumbs went into the basement with Mr. Taylor establish his access to that space, and events involving Mr. Apotrias later that day create the necessary nexus between the home and Mr. Gumbs's alleged criminal activity. *See United States v. Cepeda*, No. 21-cr-183 (JCH), 2022 WL 17486336, 2022 U.S. Dist. LEXIS 220317, *7-8 (D. Conn. Dec. 6, 2022) (no reasonable expectation of privacy in basement where it was accessible from the outside of the house and from a shared stairwell inside the building, and defendant lacked exclusive control of the space).

The circumstances concerning the first floor are more problematic. Investigators overlooked that the first floor is a distinct unit separate from the second floor. Investigators checked utility records but may not have realized that the first floor was listed as a different address, 23 Batter Terrace. Indeed, the issue presented by Mr. Gumbs concerning the layout of the multitenant apartment is reminiscent of a previously

cited case that made its way to the Supreme Court, *Maryland v. Garrison*, 480 U.S. 79. There, police officers obtained a search warrant for a building's third-floor apartment. When officers applied for the warrant, "they reasonably believed that there was only one apartment on the premises." *Id.* at 80. "[A]n exterior examination of the three-story building[], and an inquiry of the utility company" supported that belief. *Id.* Justice Stevens wrote for the majority, "[j]ust as the discovery of contraband cannot validate a warrant invalid when issued, so is it equally clear that the discovery of facts demonstrating that a valid warrant was unnecessarily broad does not retroactively invalidate the warrant." *Id.* at 85. The same is true here.

Mr. Gumbs argues that investigators acted with reckless disregard for the truth by ignoring indicia of tenants on the first floor. For example, he claims that there are three mailboxes attached to the front door, three gas meters, and three electric meters, though without an affidavit or evidence to support his assertion. *See INS v. Phinpathya*, 464 U.S. 183, 188 n.6 (1984) (an attorney's statements in a brief are not evidence); *Zong Yi Wang v. Sessions*, 706 Fed. Appx. 8, 10 (2d Cir. 2017). However, the photograph attached to the affidavit depicts three mailboxes: one left of the front door frame and two on the right of it. Mailboxes alone do not conclusively establish tenancy on the first floor. Indeed, a mailbox could be from a time when an apartment was previously split into two separate residences. *See* United *States v. Johnson*, 290 F. App'x 214, 221–22 (11th Cir. 2008) (evidence of three mailboxes, three apartment numbers, and three buzzers did not invalidate warrant where police discovered additional tenant at time of search).

Of utmost importance, though, ***none*** of the evidence obtained by law enforcement pursuant to the search was discovered on the first floor. The government avers that all

contraband attributed to Mr. Gumbs was found in the basement.  ECF No. 793, pg. 8.  There is no allegation that the police searched the first floor and neither the defendant nor the government has detailed what took place on November 18, 2022.  *See Kyles*, 40 F.3d 524 (holding a search remains valid if limited to those parts of the home utilized by the defendant where probable cause exists).  The warrant establishes probable cause to search the basement, and Mr. Gumbs lacks standing to challenge any constitutional violations as to the first-floor tenants.  Additionally, suppression is a drastic remedy.  *United States v. Pinto-Thomaz*, 352 F. Supp. 3d 287, 308–09 (S.D.N.Y. 2018) (Rakoff, J.).  Therefore, at best, the court would order suppression only as to items found on the first-floor apartment and nothing appears to have been found there.  *United States v. Galpin*, 720 F.3d 436, 439 (2d Cir. 2013) (holding courts may sever valid portion of a warrant from invalid segment(s) and uphold the former while suppressing items found pursuant to the latter).

The *Voustianiouk* case cited by Mr. Gumbs is inapposite.[6]  In that case, the search warrant explicitly authorized a search of the first-floor apartment and made no mention of the second-floor apartment, or Voustianouk's name.  *United States v. Voustianiouk*, 685 F.3d 206 (2d Cir. 2012) (Pooler, J.).  Only upon arrival did law enforcement realize the suspect lived on the second floor – not the first floor – and they searched the second floor instead.  As the majority put it, "[t]he officials could have called a magistrate judge and obtained a new warrant to search the second-floor apartment.  The evidence wasn't going anywhere, and neither was their suspect.  But the officials took a shortcut.  They searched

---

[6] Mr. Gumbs cited the underlying district court opinion, but the court will consider the subsequent (but uncited) appellate court opinion.

the second floor without first obtaining a warrant from a judge."  Plainly, that is not what happened here.  In this case, the police had a warrant to search *the entire home.*[7]

### E.  Good Faith Exception

"[T]he 'good-faith exception' to the exclusionary rule applies when the [officers] executing a search warrant 'act with an objectively reasonable good-faith belief that their conduct is lawful.'"  *United States v. Jones*, 43 F.4th 94, 111 (2d Cir. 2022) (quoting *Davis v. United States*, 564 U.S. 229, 238 (2011)).  The good-faith exception fails to apply only "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable."  *United States v. Clark*, 638 F.3d 100 (internal quotation marks omitted).  "Minor overstatements or simple negligence by the police" are not enough to overcome the good-faith exception.  *Raymonda*, 780 F.3d 105, 120 (2d Cir. 2015).

Mr. Gumbs's charged rhetoric aside, the good faith exception applies in this case. The affidavit's reference to a pole camera was simple negligence and the court is not persuaded that a *Franks* hearing is necessary based on that *de minimis* error.  Further, there is no evidence Judge Dooley abandoned her judicial role, or that the application was so lacking in probable cause as to render unreasonable the court's reliance upon it.

---

[7] This is not a case where, like others decided in this circuit (*See, e.g., Calderon v. City of New York*, 138 F. Supp. 3d 593, 608 (S.D.N.Y. 2015)), the government has failed to present evidence linking the defendant's criminal activity to his residence.  There is ample evidence indicating Mr. Gumbs utilized his home to store drugs.  *See Singh*, 390 F.3d 168, 182 (nexus "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience").

III.    **<u>CONCLUSION</u>**

For the reasons detailed herein, the defendant's motions to suppress (ECF Nos. 283 and 741) are **<u>DENIED</u>.**


**IT IS SO ORDERED** at Hartford, Connecticut, this 3rd day of November, 2024.

_____/s/_____
Omar A. Williams
United States District Judge
